first case on our calendar, which is Cantor v. Beech-Nut Nutrition Company. Good morning, Your Honor. Stephen Block, Silver, Gold, and Titel for the Plaintiff's Appellants. This appeal concerns the court's clear error in applying the wrong legal standard in this circuit to determine economic injury for purposes of Article III standing. The court ignored the low-threshold standard under John, which establishes economic injury in fact under this circuit standard, instead followed the standard under the Third Circuit in Johnson v. Johnson, which has subsequently been clarified, which I'll get to in a moment in a case that I am counsel in called Huertas v. Baer. But in any event, this is not just our position in this case. Another district court in this circuit, just a week or so after the lower court issued its opinion here, found the exact same thing, stating that the lower court applied the Third Circuit standard for economic injury, relying on Third Circuit cases, and it found that that standard that it set out is in conflict with the Second Circuit's standard to determine economic injury for purposes of Article III standing. I have no doubt what our standard is. I would rather, though, not find ourselves in a conflict with the Third Circuit. That is, I would rather myself be able to say this is the standard for standing, and the Third Circuit has done some things which are a bit peculiar, but those cases themselves can be distinguished in some way. I think that's right, Your Honor. I don't want to make something that has to go to the Supreme Court. I agree with Your Honor, and I think that's an entree for discussing the three cases that the court here relied on, that also relied on Johnson & Johnson and the Third Circuit, and speak to how distinguishable they are factually. One, of course, none of the allegations in those cases involved safety concerns, which are directly at issue here. Two, none of the allegations there in those cases involved adulterated or recalled baby foods. Those issues are extant here in this case, and none of the allegations in those cases demonstrated or alleged that the foods exceeded the applicable FDA guidance levels for baby foods. Here, we have clear exceeding the FDA final action levels for both inorganic arsenic and for lead, and those are spelled out in our papers, in the Notice of Supplemental Authority that introduced the congressional reporting, so that the lower court could be guided below and have all the facts at its disposal. The court seemed to ignore those allegations and those facts that we put before it. So, there really isn't now aligning this with the clarifying guidance that the Third Circuit laid out in Huertas against Bayer, which directly put the safety issue at front, and it stated that where a contaminated product is sold, it is worth less than an uncontaminated product because it's unfit for its intended use. It's exactly what we've alleged here, and that's exactly what the court had to do in clarifying the guidance from Johnson & Johnson, which then brings the Second Circuit, in our view, which brings the Second Circuit and the Third as far as the allegations in our case are concerned. And how specific do you have to be? I'm assuming you think what's in your complaint is specific enough in terms of making the allegations about the amounts or the harm that's being caused from this, that the allegations in the complaint are, they could be described as somewhat general. Is that a problem? Or tell me why you think it's not a problem, I assume. Well, with all due respect, we don't think they're general, but I'd like to widen out the lens a little bit if I could. We don't have to demonstrate any physical harm to the plaintiffs here. We've certainly alleged at length what the neurotoxic effects through bioaccumulation in children and infants are from the toxic heavy metals. We've laid out at length the specific lead and inorganic arsenic levels that were exceeded through the products that were sold, both in the ingredients that were tested as set forth in the congressional reporting, as confirmed through FDA testing, and in fact, BeechNut itself requested that the FDA confirm that testing, and its samples, in fact, confirmed it as well. So we think we've set out the specific levels that were exceeded. We don't have to prove at this stage in order for the plaintiffs to have standing, which is the only issue extant before the court today, that the specific levels were harmful to x or y degree. That's really a matter for experts down the road. What is important is the plaintiffs here as specifically alleged that had they known about the toxicity of the heavy metals in the baby foods that they purchased, or the material risk of the toxicity of the heavy metals in the baby foods, they wouldn't have purchased them, or they would not have paid the same price. We've alleged both a price premium theory of harm, and we've also alleged the benefit of the bargain theory of harm, which is espoused by the Third Circuit standing, which again is uncontaminated products, or I should say contaminated products are worth less inherently than uncontaminated products, and therefore the plaintiffs didn't receive the benefit of the bargain because the products, the contaminated products that they purchased, are unfit for their intended use here. There's no particular allegation that there are, that I saw, maybe I missed something, that there are other baby foods that you could buy instead that would not have been contaminated. Actually, Your Honor, there are specific allegations at the complaint at 197 through 207, which talk about the fact that there are two other manufacturers, Yumi and another manufacturer, which names Escapes Me at the moment, which are lower, which sell baby foods that are lower in levels of toxic heavy metals, and there's also a fair amount of expert analysis which talks about the fact that levels of heavy metals in baby foods can be lowered through manufacturing processes, sourcing processes, and the like, and in fact, the Closer to Zero program that the FDA has promulgated, although it's long delayed, and you know, we're unsure of the final status of that, although there have been guidance levels for inorganic arsenic and lead, the whole point of that is to bring the levels down and instruct the manufacturers on how to do that. The stakeholders are all working and trying to analyze how that can be accomplished. And of course, you also have the allegations about the specific representations made about testing quality, right? I mean, that's another piece of the alleged misrepresentations. That's exactly right, Your Honor. There are three pillars, if you will. One are the labels and the packaging that we allege the plaintiffs specifically relied on in making their purchasing decisions and paying a price premium, talking about the suitability and safety for the stages of development, talking about the fact that it's real food for babies, it's natural, and it contains nothing outside of the ingredients that are listed, and talking about the fact that there are... I mean, it's a little tricky. I mean, there are allegations about real or natural, but it's not clear to me that the presence of minerals that come from soil contradict that allegation. There are very general allegations about good for you, in effect, and I guess what you're saying is it's not good for you, but it does seem that the complaint is sort of crafted so that it never has to say anything, and doesn't have any ingredients other than what are listed. Well, no one would think of trace minerals as ingredients. It's got carrots. The carrots may have bugs. You don't put bugs on the menu, on the ingredient list. So the fact that there's a kind of avoidance in a certain way of saying... This is not a case, anyway, in which the allegation is the thing was labeled arsenic-free, and it wasn't. And similarly, there are allegations that I think could establish that they represent that these products are healthy in a general way, but you are avoiding saying that any actual identifiable person was ever actually harmed by any of these products. Again, Your Honor, we don't have to prove that a specific plaintiff, a child who ingested these material or these foods, were harmed for the purposes of finding standard on an economic loss theory. But to answer, Your Honor, if I may, to answer that set of statements. Specifically, Nurture and Hain, and Nurture in particular, echoed where the same allegations of stages of development, that they found not only that there was standing, but there were actionable claims on the merits based upon the purchases here. I would also say... Yeah, but you don't deny these maybe arguments that are valid against you on the merits, but that's not the issue before us. The issue before us is standing. That's correct, Your Honor. I agree 100% with your analysis. I would say, again, the theme here that's demonstrated by both Nurture and Hain is that it's a total impression that is created through the packaging and the marketing and the like, which is exactly what we've alleged here and which they got traction with in those cases. They had the benefit of, frankly, seeing our allegations and using those. But it's website representations about the testing and the rigorous standards, stricter than the government's, the fact that they comply with the government standards and test every single lot of, in particular, rice cereal, which turns out not to be accurate. The advertising talks about simple ingredients, and I know perhaps Your Honor doesn't think some of those statements taken discreetly are the be-all, end-all, but in the overall gestalt and the total impression of the packaging and the marketing and the like were found to be very compelling by both Nurture and Hain, not only in finding standing, but upholding the claims and finding them actionable on the merits. Again, I would go back to the labels here, which talk about not only the stages of development and the natural qualities of the foods, but also specifically talk the beneficial heavy metals like iron and zinc that are in the products because they help, and this is spelled out on the package, they are favorable for neurological development, which is ironic here because the toxic heavy metals that they don't disclose, and this is really a partial omissions case, the toxic heavy metals that they don't disclose are neurotoxic for the development of infants and children. So there is an irony here in terms of the labels and packaging, specifically aimed at BeachNuts' efforts to market these products to the public. All right, I think we have your positions. You've got some rebuttal time. Thank you, Your Honor. Thanks. May it please the Court, Ashley Parrish. Yes, you can raise it. A little further. Where's the other one? This one? No, no, that one right there. Oh, the other one, sorry. Yeah, I think I've got it all the way. Sorry. May it please the Court, Ashley Parrish for BeachNut. Your Honor, in light of what we've heard, I think what might be helpful to the Court, and our main complaint on the standard is, Judge Lee, your point, which is this is happening at a very high level of generality, and I'd like to focus specifically on what they need to plead for the claims they've alleged. And then, Your Honors, what I'd like to do is look at the allegations, and it's helpful and important, I think, to separate between two things, all baby foods, which is the focus of their complaint in general, and let me explain why there are no allegations there to support their theories, or at least plausible allegations. Why does any of this go to standing? It is, I hear an awful lot of things on your side that may be very convincing on ultimately the merits, but that's not what it's about. What it's about is our notion that economic loss claims are enough for standing, and I just don't understand, frankly, I don't understand what Judge Hurd did here. So, Your Honor, let me address that, because I do think that not to be in conflict with this Court's previous precedent and the Third Circuit, you at least need to find a plausible allegation of injury in order to establish standing, and our point is they haven't, and what I'd like to do is go through both their general allegations about baby food, and then there's more specific allegations about rice cereal, and show that the baby food allegations are far too general. The rice cereal ones don't save those specific claims. So you're not, you're not, in other words, at least if I understand you correctly, you're not actually arguing that economic loss is not sufficient for standing? We are not arguing that, but Your Honor, if I could walk through the different types of economic losses, because there's two theories they could be pleading. Well, I mean, it seems to me that this is fairly straightforward in one sense, which is, maybe I'll put in the form of a question, why is this different than any other misrepresentation as to quality of a product that the basis for standing is you didn't get what you paid for because there was a representation about what it was? That wasn't true. So why is this not just that, insofar as we're focused on economic injury as the nature of the injury? Yes. So, Your Honor, I'm exactly with you. If you'd let me, let me just, your question actually implicates two line of cases, and let me just explain it. The one line of cases is what you bought was worthless, meaning it had no use at all. That's the poorest case, where because it has benzene in it, the product is recalled, they're told you cannot use it, do not use it at all, and they can't use it for the purpose that it was purchased for. That's the first line of cases. The second line of cases is where it's worth less in the meaning that it's not as worth as much as they paid for it. That's the price premium. In order to do that, there's two types of claims they could be making. There's the John case, where the price is directly connected to the representation. So in that case, the idea that it was, you know, a certain weight and it wasn't, or Your Honor, your example, if we said it's arsenic-free and it wasn't. That's not this case. Then we get to the type of case that they really have here, which is totally different from those two, which is a comparator case, which is what they're saying is that you told us that our products were either superior or the same as other products, but they turned out to be not superior or worthless. Well, I'm not sure I understand that either. I mean, if I buy an appliance that's represented to operate in a certain way, and it does not, in fact, operate in that way, it's possible, I suppose, that on the merits, when you get drilled deep down and have expert testimony about how things get priced, that might not prevail on the merits. But I just don't understand why we can't, at the standing level, just assume that if you say this operates entirely off the Internet when it doesn't, and some people like things that operate off the Internet, and, you know, why aren't you clearly injured because you were induced to buy something at a particular price that wasn't what it purported to be? Your Honor, for two reasons here why this is different, although I agree with your hypothetical. So two reasons. One is that we know that all products contain some background levels of these heavy metals. So it's sort of like complaining that the air... But when you say we know that, I was very interested in this because I think it does go to the merits of this in the sort of introductory pages of your brief. Are those things that they allege in their complaint? Are these things that we can take judicial notice of? I think, Your Honor, you can take judicial notice of the FDA's findings, which they don't really contest, that heavy metals are present everywhere. The question is whether it reaches a level that is dangerous or not. But if these people say, you say there are no heavy metals, I don't want to buy things which have heavy metals, isn't that enough for standing? Because it says I wouldn't have done it. I have even if there are no others. Maybe they'd prefer to starve. I don't care. That's all a matter of the merits. So, Your Honor, with all respect, no, for two reasons. One is, Judge Lynch, going back to your point, nobody has ever alleged that we said these do not contain heavy metals. That's not an allegation. And second, if I can use my example again, CO2, if you are in an isolated area with too much CO2, it could be toxic. If you're in the world, everyone knows there's CO2. So you have to have some plausible allegations that say we're not on the beach just breathing in fresh air. We're in an area where the CO2 is at a toxic level. The problem is... What is wrong with the allegation that either the FDA or even some medical body of experts has said, and this might be contestable and it might lose on the merits, that here's how much what the arsenic level needs to be. And testing shows that the beach nut products were in excess of that level. So, Your Honor, thank you. That really gets to the core of what I wanted to talk about in terms of the different allegations. So if I could turn to that. So, Your Honor, on the first question about the baby foods, there's only two, in general, there's only two things they do because they don't have that testing. What they do have is two things. One is they say that there are some ingredients in the staff, the congressional staff report. It's not a scientific report, but there's some ingredients that have elevated levels compared to FDA levels. But those are things like cinnamon or cardamom that are in very small quantities. And there's no allegations that suggest that the small quantities would mean that the finished products have elevated levels. So this is the issue of the ingredients testing. That if there are ingredients that have excess levels and that ingredient makes up only 0.1% of the total mix that goes into the baby food, then the finished product is nothing that says the finished product is going to be in excess. Correct. And you would want a plausible allegation to connect those. And you would also want it, and this is the second problem, that would connect it to alternative comparative products. So we know they have to buy, feed their babies. So the question is, what would they have bought that was not- You are very convincing, and I still do not understand why that has anything to do with standards. I mean, you're convincing of America. Your Honor, first, thank you. From you, I appreciate that. But let me say, Your Honor, the reason why this is important is that there has to be a plausible allegation of injury. If all they allege for baby foods in general are two things, one is that certain small ingredients might have elevated, that isn't a reasonable, plausible allegation that the products they bought were anything other than what they thought they were getting. And then the second, Your Honor, again, Judge Lynch, if I come back to you, if you look at his answer to your questions and you take a look at paragraphs 197 to 207 of the complaint, all they do is they allege there's other baby foods out there that might have lower levels of heavy metals. They don't tell you that they're the same products. They don't allege how they were tested, what they were. The only allegation is paragraph 205, where they say one competitor product maintained levels at 23 parts per billion. But they never allege that any of the products they purchased at us were not exactly the same, that 23 parts per billion is not safe or is safe, or that any of the products that we did. So for all of the baby foods in general, that's all they have. Judge Lynch, that takes us to the rice cereal, because we think you at least need to affirm the district court on everything else. The only one that they keep going back to is the rice cereal, because it gets to your point that in that case, they do connect it to a recall and they do connect it to FDA testing levels. And so there you might say, maybe there's a tested some products, but here's the reasons why that inference isn't plausible here, and they haven't connected the dots. They rely on a supplemental staff report. In that staff report, what it says, and they incorporate that in the complaint, the staff report says that eight out of 26 products were tested and all those are, sorry, 26 products were tested, eight were elevated levels. But if we look at the average, it was only at 85 parts per billion, which is well below the FDA elevated levels. And so the question is, is they do not allege that any of the products they purchased were parts of those lots. They don't. None of the items that they purchased could be part of those lots unless they lived in Alaska during a very narrow period. But right, Your Honor, but the point is that if it was recalled and they were told not to eat those particular ones, and it was part of the argument, but instead what they're asking you to make an inference that because a third of a particular lot was recalled, you should then assume that all other rice cereal is also at the level. And the problem they have with all of these allegations is they're just asking you to assume that you can divine in the air what a dangerous level of heavy metals are. They keep saying it's harmful and it's dangerous, but there's no allegations that provide a baseline for you to compare our products to what the alternative product was. So again, in Huertas, you knew that the skincare product, you could compare what they purchased. They couldn't use it. Therefore they were injured because the other product, they had to throw it out. They could have bought something else. In the case of John, we know that there was a direct connection between the price and how it was advertised. The problem here is there's no connection. All they're saying is that we would like lower levels, but they don't actually ever allege what is a level that would be unsafe or what any other product had that wouldn't mean that that product was at a different level. So all we would know is they would like lower levels of heavy metals in their products, but they don't tell you that there was any other product that would have been comparable. What about the testing allegations? As I understand the allegations, it's claimed that BeachNut advertised itself as having the best testing state of the art stuff, testing for these kinds of things. And it turns out that unlike some other companies, they didn't ever test the final products, only the ingredients. So why would that not be a very specific allegation that there is a false representation that if you buy this product, you can rest assured that it has been effectively tested as well as anyone can do when that's not true? Well, so Your Honor, but then the next question you would have to ask yourself is, and we obviously, Judge Calabresi, I totally agree with you. This is a merits question. We disagree with how they're characterized. Yes, of course. But notwithstanding that, if you take a look at that, the next question you would say is, okay, so you tested each of the ingredients of how FDA tells you, you didn't test the finished products. So maybe that testing wasn't as good as you said it was, but what was the difference in the finished product? What made this product? Why is that even germane? We're not necessarily talking about a claim. Of course, if they made that claim, they would clearly have standing that my child developed neurological problems. And the answer on the merits might well be, yeah, but there's nothing that really ties this to that. But here, what the people are saying is, look, we're living in the real world. Every parent of a child doesn't have a scientific laboratory in which they can test the products that they buy in the supermarket. When we go to buy something in the supermarket, we relied on the representation that this was recognizing, suppose they're sufficiently sophisticated as to recognize that these kinds of minerals appear all over the place. We can't necessarily be free of them, but we can at least rely on somebody who tells us that we do the best state-of-the-art job in making sure that our products don't contain these things. Why isn't that a material representation that, you know, I wouldn't have bought this. I would have bought the cheapest thing on the market if I knew it was no different in terms of the testing or maybe even superior. Okay, so you're on. Let me unpack that. First, I agree with you, they don't allege injury. We're not saying that that's fatal to the claim of injury. Right, so push that aside. So on the second thing, I was with you until a couple things that you said at the end, which is different from what they've alleged. First, you suggested at the end that there might have been superiority claim. Not just that we tested, but that the product actually in the end result. No, no, no, no, no, I didn't say that. Okay, well, no, excuse me. I'll clarify because I may have not been clear enough and so you're answering something that wasn't what I intended to ask. That's not your fault, it's mine. But it is your fault if you're going to not let me restate the question. Please do, please do. Okay, I can't know as a parent what product has more or less of this stuff in it. The best I can do is rely on someone's claims about the steps that they take to minimize it. And if someone who is, I mean it is a premium product in the sense that it's not the cheapest thing in the market. It may, I understand there could be questions about why, what is it about their advertising that makes people think they're good or makes people pay a higher price. But one of the components is there is a specific representation. So if I'm somebody who really told that this is the best, this is the state of the art, and if that is not true, then I have no reason to buy that product. So your honor, I think that what you're being told is that the testing is state of the art. But the question you have to ask yourself is they're testing for unsafe levels. We all generally... It doesn't matter, but it doesn't, excuse me, it doesn't matter if you say I test and the other one doesn't test. I may choose to buy your product because you test, regardless of what effect that has. But the moment I do that, I am buying as a result of your misrepresentation. Now that is enough for standing under our rules. The fact that this may be irrelevant of a merit doesn't matter. You say A, I buy because of A, because I think that's important. That's enough. But your honor, that is not what they have alleged here because they have not... They have alleged that we are testing the products. They have not alleged that any of the products were tested out of a range. It's like my example of going to the beach. And if I suddenly said, I relied on the fact that the air quality is good here and you tested it, and then I suddenly say that the air quality is not as good as I would have liked, I need a benchmark, some baseline to say that the product compared to other products was actually worse. They didn't... There wasn't anything in the statement. Why is... I'm not sure... I still don't quite follow why that's so. Because that... Or at least to whatever extent it is so, it sounds to me like something that's materiality, which is a different kind of merits question. In other words, if the plaintiffs are idiosyncratic cranks who have some specialized reason to not want a product of a particular description that in fact a reasonable person wouldn't care about at all, that's one thing. And that may be true. I don't know. But that would be a question of the materiality of the representation. But we still have people who are saying, I'm trying to minimize these risks and I rely on a representation that the best way I can do that in effect is to go with the people who do the best testing. But we're not saying that we're testing it to eliminate the amount. We're saying we're testing it to make sure it doesn't get up to harmful levels. So for example, Your Honor, in the complaint itself... Why does that matter? Because... If they... Excuse me. I'm sorry, say we rely on the best testing for whatever reasons we want, then the fact that that isn't what has happened is enough for standing. And I don't know. You keep arguing other things. No, but Your Honor, they have to connect the testing to the price. And the point is, is that what they're trying to say is that because you said you were testing for harmful levels, and we didn't like your testing, that this product was somehow not as good as the next product. So let's say that they say that there was another product that had 23 parts per billion. So let's say our product was 22 or 25. How do you say that that is not the price that they paid without having some way of understanding where it is that you get to the point that the parts per billion make that the product no longer what it is? Everyone knows they got healthy baby food. Everyone knows that what was advertised... We may have a different view of what is needed. But the way I look at it, if somebody says the product has been made in San Francisco, and it has a price that is higher. And instead, the product was not made in San Francisco. And as far as I'm concerned, I, for my own crazy reasons, am willing to pay more for a product that was made in San Francisco. That may be a crazy, stupid, may have nothing to do with the price of eggs. But if that is what I am, and that I think they have alleged in a thousand different ways. So Your Honor, if it was San Francisco, I would be agreeing with you 100%. The problem is, is what they've said is that there's a, for example, an advertisement that says this is flavorful. And now they're complaining that it's not flavorful enough. In order to do that in the context of heavy metals, they need to do one of two things. They either need to show with scientific allegations that the level that it has reached is not a background level that we expect in all these products, but dangerous. The only one they have close to is rice. Or they have to allege that there's something in a comparator product at a different price, but the same sort of thing. We bought applesauce, they made applesauce, and there was enough of a difference that it actually made some reason to think that the price was different. But they haven't. All they've said is not that this is San Francisco, but just that we bought a product, and along the way, we now have this idea that it would be more flavorful. That isn't enough to demonstrate injury. Otherwise, the courts are in the position of making just policy judgments rather than connecting to a true economic injury that's been alleged. All right. All right, Mr. Parrish, I think we have your position. Very gracious. Thank you. I just have five points, and I'll try and make them quickly. One, when we talk about safety, there have been a number of mischaracterizations up here at the just to clarify. With respect to the rice cereal, that testing found that eight of the 26 samples exceeded 100 parts per billion, which is the standard. On the average, all 26 were 85 parts per billion. Significantly, the FDA has said, just because we've set a level of 100 parts per billion for inorganic arsenic in rice cereal doesn't mean that that's safe. That just means that it's the level at which it's deemed adulterated. There is no specific, quote unquote, safe level, and so comparing an average of 85 parts per billion to 100 parts per billion or above is immaterial at this juncture in order to determine standing. With respect to lead, as we outlined, those are set at staggered 10 parts per billion and 20 parts per billion in the FDA final guidance. The tests explicitly show that cinnamon, the ingredient cinnamon, which counsel mentioned, tested as high as 886 parts per billion, which is hundreds of times more than the standard, or I should say dozens if not more times the standard that the FDA has set. And if you look at the report that we referenced, there are ingredients, there are foods such as sweet potato and mango and prune and the like that are all used, which blew through any FDA alleged safety standard, but certainly the guidance. With respect to what they said on the website about their testing, I mean, I think it's important to read. The standards are even stricter than government requirements. Our quality processes don't end there. Once farmers send us their very best fruits and vegetables, we test for up to 255 pesticides and heavy metals like lead, cadmium and arsenic and other nasty stuff. Just like you would, we send the products back if it's not good enough. Even in the case of our infant rice cereal, which is already below the proposed FDA limit for arsenic in rice cereals, we still test every single lot to ensure it's safe to consume. I think there's a juxtaposition there that speaks volumes in terms of what they actually engaged in in practice. With respect to, I thought I heard counsel say that plaintiffs don't have testing. The plaintiffs, as your honor pointed out, don't have the means to engage in testing, but independent and third-party testing is the standard under John. It's been upheld by other, the other district courts that have examined these issues, nurture pain and the like, and that is what is sufficient. Nor is that the accuracy of that testing appropriate to determine standing. That's a, that's an issue that could be a factual issue on the merits down the road, but certainly not for the purposes of standing. The last point I want to make is we don't need to allege competitor products in order to establish a price premium theory of harm. And in particular, we don't need to establish at the standing stage the prices of the other competing products. That was specifically addressed in nurture and in pain. And as counsel said, I believe I heard him to say, we need to connect the testing to the price of those competitor products. Again, that's a classic merits issue. We may get into that down the road. I understand that, but this is all about Article III standing, which was the sole basis on which the court dismissed this action. Thank you, Your Honor. All right. Thank you very much. Thanks. Thank you to both of you. We will take this case under advisement.